UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RORESTE REFUERZO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SOUTHWEST AIRLINES CO.,<br><br>Defendant. | Case No.  22-cv-00868-JSC<br><br>**ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND PLAINTIFFS' MOTION TO EXCLUDE REBUTTAL EXPERT REPORT**<br><br>Re: Dkt. Nos. 172, 173 |

Plaintiffs, on behalf of themselves and three certified classes, allege Defendant violated the Family and Medical Leave Act ("FMLA") and California's Family Rights Act ("CFRA") by deeming employees ineligible for disciplinary forgiveness if they used protected leave.  Before the Court are Plaintiffs' motion to exclude Defendant's rebuttal expert report and Plaintiffs' motion for partial summary judgment on Defendant's failure-to-mitigate-damages affirmative defense. (Dkt. Nos.  172, 173.)[1]  For the reasons set forth below, the Court grants in part and denies in part Plaintiffs' motion to exclude Defendant's rebuttal expert report and excludes the portions of Mr. Volk's report that address class members' failure to mitigate damages.  The Court denies Plaintiffs' motion for partial summary judgment because, drawing inferences in Defendant's favor, the sheer number of flight attendant job openings, coupled with class members' testimony they saw or obtained similar flight attendant positions, permits an inference there were substantially equivalent jobs which Plaintiffs could have obtained.

//

//

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

United States District Court<br>Northern District of California

United States District Court
Northern District of California

# BACKGROUND

**A.     The Second Amended Complaint and Plaintiffs' Requested Relief**

Plaintiffs' Second Amended Complaint ("SAC") alleges five class-based causes of action: (1) "Interference in Violation of the [Family and Medical Leave Act ('FMLA')]," based on 29 U.S.C. § 2615(a)(1); (2) "Discrimination and Retaliation in Violation of the FMLA," based on 29 U.S.C §§ 2615(a)(1) and (2); (3) "Discrimination and Retaliation in Violation of [ California's Family Rights Act ['CFRA']," based on Cal. Gov. Code § 12945.2(1); (4) Wrongful termination; and (5) Unfair Competition.  (Dkt. No. 84 ¶¶ 59-89.)  The first two causes of action are brought on behalf of nationwide classes, and the other three are brought on behalf of California sub-classes. (*Id.*)  The Court granted Plaintiffs' motion for class certification, in part, certifying three classes. (Dkt. No. 106.)  Then, on May 18, 2026, the Court denied Defendant's motion for decertification and granted Plaintiffs leave to file a motion to substitute a new or additional (b)(2) class representative.  (Dkt. No. 197.)

Plaintiffs request several remedies under the FMLA.  As relevant here, Plaintiffs request "the recovery of back pay, front pay, injunctive relief, compensatory damages, special damages, general damages," and "offers of restatement" under the FMLA and FMLA regulations.  (Dkt. No. 84 ¶ 100.)  The FMLA provides "[a]ny employer who violates section 2615 of this title," *i.e.*, the FMLA's prohibition on interference, discrimination, and retaliation,

> shall be liable to any eligible employee affected—
>
> (A) for damages equal to—
>
>> (i) the amount of—
>>
>>> (I) any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; or
>>>
>>> (II) in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to a sum equal to 12 weeks (or 26 weeks, in a case involving leave under section 2612(a)(3) of this title) of wages or salary for the employee;

United States District Court
Northern District of California

[…]

(B) for such equitable relief as may be appropriate, including employment, reinstatement, and promotion.

29 U.S.C. § 2617(a)(1)(A)-(B).  Similarly, FMLA regulations provide:

Any violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act. An employer may be liable for compensation and benefits lost by reason of the violation, for other actual monetary losses sustained as a direct result of the violation, and for appropriate equitable or other relief, including employment, reinstatement, promotion, or any other relief tailored to the harm suffered.

29 C.F.R. § 825.220(b).  Plaintiffs request the same remedies under the CFRA.  (Dkt. No. 84 ¶ 101) (requesting "restatement, as well as the recovery of back pay, front pay, injunctive relief, compensatory damages, special damages, [and] general damages[.]")

### B.  The Parties' Expert Reports

To understand the parties' experts' opinions, one must understand front pay and back pay. "Front pay is 'money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement.'" *Traxler v. Multonmah Cnty.*, 596 F.3d 1007, 1009 n.1 (9th Cir. 2010) (quoting *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001)). By contrast, back pay typically measures an employee's lost compensation up "to the date of judgment." *See Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1495–96 (9th Cir. 1995).  Either award may be reduced or denied if the employee "failed to mitigate [their] damages," which requires the employer to prove "during the time in question there were substantially equivalent jobs available, which [the employee] could have obtained and that [the employee] failed to use reasonable diligence in seeking one." *Id.* at 1497 (cleaned up) (applying that standard to a back pay award); *see E.E.O.C. v. Pape Lift, Inc.*, 115 F.3d 676, 682–83 (9th Cir. 1997) (addressing front pay).

Plaintiffs disclosed their expert, Dr. Jeffrey Petersen, and his report on January 16, 2026. (Dkt. No. 172-1 ¶ 2.)  Dr. Petersen's report proposed a methodology "to assess the economic damages of the class members who were terminated by Defendant."  (Dkt. No. 172-2 ¶ 1.)  The methodology was to add class members' "past income loss and future income loss."  (*Id.* ¶ 6.)  As relevant here, for past and future losses, Dr. Petersen's methodology added the value of lost

3

wages, health insurance, and employer-provided retirement and savings. (*Id.* ¶¶ 12-20.) Dr. Petersen then subtracted "mitigating wages," *i.e.*, "[i]ncome that was earned after termination." (*Id.*) Past income losses were calculated "from the date of termination to the trial date," (*id.* ¶ 7), which measures back pay. *See, e.g.*, *Odima*, 53 F.3d at 1495–96. Future losses were measured from trial to the end of "three alternative catch up periods," *i.e.*, the date when projected earnings become equal to mitigating wages. (*Id.* ¶¶ 7, 19.) So, future losses encompass some lost compensation incurred after judgment, which is relevant to a front-pay award. *See Traxler*, 596 F.3d at 1009 n.1. Dr. Petersen set forth each class member's damages in tables accompanying the report, but Plaintiffs did not attach the tables to their motion to exclude. (*Id.* ¶ 21; *see generally* Dkt. No. 172.)

Aside from defining "mitigating wages" as "[i]ncome that was earned after termination," Dr. Petersen's report does not reference any class member's efforts to find new employment or otherwise mitigate losses. (*See generally* Dkt. No. 172-2.) At his deposition, however, Dr. Petersen was asked about how a class member's job search would affect his damages calculations.

> **Q** Now does [class members'] effort in terms of how they search for jobs affect the catch up period or their future loss?
>
> **A** It -- of course it would affect it, and that would be shown in the earnings that they have. If someone made no effort and never got a job or they made an incredible effort and they were not able to find employment, you would see zeros there. But the -- the benefit of this being a -- a class action is that those should cancel each other out, such that, on average, you would see reasonable efforts being made due to the large sample size we have of claims being made, such that an individual analysis of effort does not seem to be needed based upon my analysis in this matter.

(Dkt. No. 185-4 at 8:13-25.) So, if a class member obtained a job after termination, Dr. Petersen's report subtracted their actual earnings, called "mitigating wages," from lost income. (*See id.* at 8:13-25; Dkt. No. 172-2 ¶¶ 12-20.) But Dr. Petersen's report does not discuss the new job, a class member's efforts in finding the job, or any other facts relevant to a terminated employee's legal duty to mitigate damages.

Defendant submitted Mr. Volk's report on February 16, 2026, the due date for rebuttal expert disclosures. (Dkt. No. 172-1 ¶ 3.) The report is titled "EXPERT REBUTTAL REPORT."

United States District Court
Northern District of California

4

(Dkt. No. 172-3.)  In his report, Mr. Volk explains "I have been retained to provide rebuttal opinions" in this case, including "responding to" Plaintiffs' expert.  (*Id.* at 2.)  Mr. Volk provides "individualized rebuttal assessments for […] five exemplar class members[.]"  (*Id.*)  "These individualized assessments include general rebuttal to Dr. Petersen's methodology, which would apply to all of the class members."  (*Id.* at 2-3.)

Take, for example, Mr. Volk's assessment of class member Valerie Barajas, which illustrates Mr. Volk's criticism of Dr. Petersen's methodology for all class members.  Mr. Volk reviewed materials produced in discovery and Dr. Petersen's report and deposition.  (*Id.* at 4-5.) Ms. Barajas was terminated on June 30, 2023, roughly three years before the trial date.  (*Id.* at 6.) At her deposition, she testified she only applied to one job position after her termination because she was caring for her child, became pregnant again, and gave birth to another child.  (*Id.*)

Mr. Volk's report then includes an eight-page section titled "discussion of / response to Dr. Petersen's analysis."  (*Id.* at 6-14) (cleaned up).  Mr. Volk recounts "Dr. Petersen's narrative report provides no details on individual class members" and instead applies "the same methodology for … all putative class members."  (*Id.* at 6 (quoting Dkt. No. 172-2 ¶ 6).)  Next, Mr. Volk notes "Dr. Petersen assumed that each of the class members was capable of working as a flight attendant for the entire period between date of termination and date of trial," but "Ms. Barajas was clearly not making herself available for full-time work throughout the pre-trial period" since she was pregnant and raising children at the time.  (*Id.*)  This, Mr. Volk opines, "call[s] into question Dr. Petersen's 'one size fits all' modeling."  (*Id.* at 6-7.)  Specifically,

> in my opinion it is important to do an individualized assessment of relevant factors and information for each class member; Dr. Petersen's "one size fits all" methodology for calculating damages for the entire class fails to address important considerations. One of the primary areas of importance relates to the topic of mitigation of claimed loss of earnings and benefits resulting from a termination. It is my understanding that a plaintiff in an alleged wrongful termination matter has a duty to mitigate their claimed damages through reasonable efforts to achieve comparable employment.
>
> In my profession, reasonable job search expectations for comparable employment can be based on guidelines for job seekers published by the California Employment Development Department (EDD). In the EDD publication, "Merchandising Your Job Talents," they write that a job search should be a full-time endeavor. Specifically, they write,

"You work a 40-hour week for your employer; you should work no less for yourself." In another EDD publication, "Tips for Finding the Right Job in California," they write, "Finding work is a fulltime job!"

(*Id.* at 7-8.)

Mr. Volk then asserts an article Dr. Petersen relied on "raise[s]" "the duty to mitigate claimed damages." (*Id.* at 8.)  Per Mr. Volk, "an assessment as to whether the search for new employment has been dutiful towards mitigating loss is an important factor according to" the article's authors because the authors' "preferred methodology in assessing damages is 'to consider that the displaced worker has a duty to mitigate damages and incorporate a measure of mitigation in the damages estimate.'" (*Id.* at 8.)  Put another way, Mr. Volk opines Dr. Petersen should have specifically assessed "whether" a class member "has been dutiful" because two authors' purportedly "prefer[]" "to *consider* … a duty … and incorporate *a measure* of mitigation." (*Id.*) (emphasis added).  Additionally, Mr. Volk then responds to Dr. Petersen's testimony about how he expects class members, on average, had reasonable mitigation efforts: "[n]owhere in the … article do the authors indicate that reasonable mitigation efforts are simply assumed to have been undertaken […] nor do the authors indicate any expectation that across a group of similarly situated claimants, on average they would make reasonable mitigation efforts." (*Id.*)

Mr. Volk also briefly takes issue with certain details in Dr. Petersen's report.  For example, Mr. Volk observes Dr. Petersen overstates Ms. Bajaras' damages because he (1) did not use a certain model for calculating damages which incorporates "catch-up periods," (2) did not consider Ms. Barajas' average length of employment with her prior employers in predicting her future lost wages from Southwest, (3) premises his analysis as if Ms. Barajas would "exclusively … work as a flight attendant" instead of other opportunities like customer service, (4) assumes a lower 401(k) contribution rate for mitigation employment than Southwest's contribution rate, and (5) does not account for money Ms. Barajas saved by not paying Southwest's union dues.  (*Id.* at 5-14.)  At no point does Mr. Volk opine Dr. Petersen's methodology is unreliable or discredited because, say, Dr. Petersen's equation considered variables that economists do not consider.  For the most part, Mr. Volk's "discussion of / response to" Dr. Petersen's report is the report should have considered some details, like Ms. Barajas' job search, and should have tinkered with a few variables, like

6

401(k) contribution rates.

Some of Mr. Volk's opinions relate to front pay, but most of Mr. Volk's criticisms pertain to Dr. Petersen's back pay calculations.  Because Dr. Petersen's "catch-up periods" include time after judgment, (*see* Dkt. No. 172-2 ¶¶ 7, 19), Mr. Volk's critiques regarding Dr. Petersen's catch-up periods relate to front pay calculations.  But Mr. Volk's opinions about class members' job searches concern facts that already occurred, so they are effectively opining on damages incurred prior to judgment.  Similarly, Mr. Volk's opinions rebutting the assumptions in Dr. Petersen's "one size fits all modeling"–for instance, class members were "capable of working … for the entire period between the date of termination and date of trial"–only encompass lost compensation incurred before judgment.  (*See* Dkt. No. 172-3 ¶¶ 5-14.)  Those latter opinions are therefore relevant to back pay, not front pay.  *See Odima*, 53 F.3d at 1495–96; *Traxler*, 596 F.3d at 1009 n.1.

### DISCUSSION

### I.    Plaintiffs' Motion to Exclude Mr. Volk's Report

Under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Plaintiffs move to exclude "the rebuttal expert report and testimony of Karl Volk in its entirety" or, in the alternative, "the portions of Mr. Volk's rebuttal report that discuss the defense of failure to mitigate" for three reasons: "1) it is not proper rebuttal but an untimely affirmative expert report; 2) it offers impermissible legal opinions rather than expert economic analysis; and 3) it is not based on any reliable methodology tied to the governing standard for mitigation of damages."  (Dkt. No. 172 at 6, 7.)  The Court agrees, in part, on the first point, and therefore excludes Mr. Volk's opinions regarding the failure to mitigate.

Although Mr. Volk's report's assessments of class members resemble an affirmative expert report in some respects, it is not an affirmative evaluation of damages because, as Plaintiffs agree, Mr. Volk "provides no alternative model" and "no recalculations."  (*Id.*)  And on its face, Mr. Volk's report rebuts Dr. Petersen's methodology and conclusions by noting Dr. Petersen "overstates" damages because Dr. Petersen did not consider certain class members' availability to work full-time and average length of employment.  (*See, e.g.*, Dkt. No. 172-3 at 6-14.)  In that

sense, those aspects of Mr. Volk's report "contradict or rebut evidence on the same subject matter" as Dr. Petersen's report, namely calculations for a potential back pay award. *See In re High-Tech Emp. Antitrust Litig.*, 2014 WL 1351040, at *3 (N.D. Cal. Apr. 4, 2014) (quoting Fed. R. Civ. P. 26(a)(2)(D)(ii)); *Odima*, 53 F.3d at 1495–96. And because they are proper rebuttal, they are permissible expert analysis and need not offer an alternative methodology for calculating damages. For example, paragraphs 1-6, 11, 13, and 15-24 of Mr. Volk's assessment of Ms. Barajas's damages and paragraphs 1-3, 7-8, 13, 15, and 17-26 of Mr. Volk's assessment of Mr. Refuerzo's damages are proper rebuttal because they offer background or opinions regarding Dr. Petersen's report unrelated to class members' failure to mitigate damages. (*See* Dkt. No. 172-3 at 9-26.)

That said, the Court excludes the portions of Mr. Volk's report that discuss the defense of the failure to mitigate damages. Defendant's affirmative defense asserts "[a]ny recovery on Plaintiffs' SAC, or any cause of action contained therein, is barred in whole or in part by Plaintiffs' and other similarly situated employees' failure to mitigate their damages." (Dkt. No. 86 at 13.) The parties agree to prevail on this defense, Defendant bears the burden of proving two elements.[2] First, "there were substantially equivalent jobs available, which the plaintiff could have obtained." *Odima*, 53 F.3d at 1497 (cleaned up). Second, "plaintiff failed to use reasonable care and diligence in seeking such a position." *Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir. 1978).

Dr. Petersen did not discuss either element, so Mr. Volk's opinions regarding the affirmative defense are not proper rebuttal. Specifically, Mr. Volk "estimated flight attendant

---

[2] The affirmative defense is rooted in the traditional duty of an injured party to mitigate damages, but the parties cite case law interpreting the back-pay provision in Title VII, which says "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." *Sangster v. United Air Lines, Inc.*, 633 F.2d 864, 867 (9th Cir. 1980) (quoting 42 U.S.C. § 2000e-5(g)). The Court will assume without deciding the defense applies to Plaintiffs' FMLA claims. *See Rightsell v. Concentric Healthcare Solutions LLC*, 2023 WL 6248536 at *1 n.1 (D. Ariz. Sept. 26, 2023) ("Both parties cite cases involving mitigation in the context of Title VII claims, thus, the Court assumes Title VII mitigation principles apply."); *see also Sias*, 588 F.2d at 696 (interpreting the defense in light of "the injured party's traditional duty to mitigate damages" and Title VII); *Sangster*, 633 F.2d at 867 ("As a broad proposition, injured parties are expected to mitigate the damage they suffer. This notion is expressed in Title VII[.]")

openings" available to class members, opined as to what, "[i]n my profession, reasonable job search expectations for comparable employment can be based on," faulted Dr. Peterson for not considering "the duty to mitigate claimed damages" and "the reasonableness of [class members'] mitigation efforts," and estimated economic losses for class members "[a]ssuming hypothetically" what "the finder of fact determines" with respect to "reasonable efforts to mitigate [class members'] claimed damages." (*See, e.g.*, Dkt. No. 172-3 at 6-10.)  Those opinions directly bear on both elements of the failure-to-mitigate defense.  But Dr. Petersen's report did not discuss either element; the report's only reference to "mitigation" is to a class member's actual earnings, not the duty to mitigate or Plaintiffs' job searches.  (*See* Dkt. No. 172-2 ¶¶ 12-20; Dkt. No. 185-4 at 8:13-25.)  So, although Mr. Volk styles his opinions as a "discussion of / response to Dr. Petersen's analysis," (Dkt. No. 172-3 at 6-14) (cleaned up), Mr. Volk's discussion is not proper rebuttal because it does not "contradict or rebut evidence" of actual earnings in Dr. Petersen's report.  *See In re High-Tech Emp. Antitrust Litig.*, 2014 WL 1351040, at *3 (quoting Fed. R. Civ. P. 26(a)(2)(D)(ii)).  Nor are Mr. Volk's discussions "on the same subject matter," *id.*, because his opinions address an affirmative defense Dr. Petersen did not raise, and for which Defendant bears the burden of proof.

Defendant's argument Mr. Volk's mitigation opinions are proper rebuttal because "mitigation is a material part of [Dr. Petersen's] damages framework, given that past and future 'mitigating wages' were embedded directly into his economic loss formulas" is unavailing.  (Dkt. No. 185 at 14.)  Defendant misunderstands Dr. Petersen's definition of "mitigating wages," *i.e.*, actual earnings from a new job.  (Dkt. No. 172-2 ¶¶ 12-20.)  By contrast, the duty to mitigate examines available, equivalent jobs and a plaintiff's reasonable care in finding a job.  True, Dr. Petersen's report said the word "mitigating," but his definition of "mitigating" limited the scope of proper rebuttal to, say, contradicting or rebutting a calculation of what Plaintiffs actually earned in their new jobs.  (*See id.*)  Dr. Petersen did not opine on whether Plaintiffs exercised reasonable care in finding substantially equivalent jobs.  (*See* Dkt. No. 86 at 13); *Odima*, 53 F.3d at 1497; *Sias*, 588 F.2d at 696.

Accordingly, the Court grants Plaintiffs' motion and excludes Mr. Volk's opinions

9

discussing Defendant's affirmative defense, *i.e.*, what substantially equivalent jobs Plaintiffs could have obtained and Plaintiffs' use of reasonable care in seeking new jobs. Given Plaintiff does not identify specific paragraphs which should be excluded, the Court will hear argument at a later date regarding which paragraphs to exclude.

### II.    Plaintiffs' Motion for Partial Summary Judgment

"Plaintiffs seek partial summary judgment dismissing Defendant's affirmative defense of failure to mitigate damages." (Dkt. No. 173 at 3.) Defendant has the burden of proving its affirmative defense, *Sias*, 588 F.2d at 696, and Plaintiffs move only on the issue of whether a trier of fact could find there were substantially equivalent jobs Plaintiffs could have obtained. So, Plaintiffs must show "there is no genuine issue as to any material fact" as to that issue such that Plaintiffs are "entitled to" dismissal of the affirmative defense "as a matter of law." Fed. R. Civ. P. 56(a).

Generally, "district court has wide discretion in awarding remedies to make a Title VII plaintiff whole." *Odima*, 53 F.3d at 1495. That said, "'given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.' This dual purpose is not inconsistent with the injured party's traditional duty to mitigate damages, nor does it in any way relieve him of his duty." *Id.* (quoting *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975)). In light of that dual purpose, the lack-of-mitigation affirmative defense can limit back pay or front pay awards when: (1) there were "substantially equivalent jobs which Plaintiffs could have obtained" after their termination, and (2) Plaintiffs failed to exercise "reasonable diligence" in seeking a job. *Odima*, 53 F.3d at 1497 (addressing back pay); *see also Pape Lift, Inc.*, 115 F.3d at 682–83 (addressing front pay). Plaintiffs' motion rests on the first prong.

Although the Ninth Circuit has not announced a hard-and-fast rule as to what makes a job "substantially equivalent," *Pape Lift, Inc.* is instructive. There, a jury returned a verdict in favor of a terminated employee who had managed "the parts department" of a "retail outlet for forklift trucks." *Id.* at 679. The district court then eliminated the front pay award because the employee

United States District Court
Northern District of California

10

failed to mitigate his damages. *Id.* at 679, 682. During his post-termination job search, the employee received "a response from the manager of a lift truck company interested in hiring [him]" for a job which "would have entailed 'several hours waiting on customers' and paid about half" of his previous salary as a parts manager. *Id.* The employer's "expert testified that he reviewed positions available … in … customer service management[ and] parts management," whereas the plaintiff "put forward evidence, however, that those jobs that were similar in kind to [the employee's] former position had salaries lower than that of his old job" and "some of those jobs listed by [the] expert … included positions as a news director" and a "music librarian," which were "substantially dissimilar to" the employee's prior jobs. *Id.* at 683.

The Ninth Circuit reversed, holding the district court erred when it "apparently concluded that since [the employer]'s evidence of suitable employment covered the fall of 1993 and the time immediately preceding trial, [the employer] had demonstrated that suitable employment would be available from the time of trial to late December 1995." *Id.* at 682.

> In *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982), the Supreme Court held that "an unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position." A plaintiff need only pursue "substantially equivalent" work. *Id.* at 232[. Defendant]'s argument may essentially be reduced to the proposition that an individual should consider working as an animal health manager or music librarian after he has been illegally discharged from his position as a parts manager in a forklift truck operation, or alternatively, that he should accept a position similar to the one he held previously, but which offers a significantly lower salary. These arguments are simply untenable, and we reject them. The jury's finding that Pape did not satisfy its burden of demonstrating that suitable work was available to Waters is thus well-supported by the evidence.

*Pape Lift*, 115 F.3d at 683. Both *Pape Lift* and *Ford Motor* mentioned, but neither adopted nor rejected, the "so-called 'lowered sights doctrine'" which is "'after an extended period of time searching for work without success, a claimant must consider taking a lower-paying position.'" *Pape Lift*, 115 F.3d at 683 (quoting 458 U.S. at 232 n.16).

Plaintiffs assert Defendant's evidence is insufficient to raise an inference there were substantially equivalent jobs Plaintiffs could have obtained. Plaintiffs note Mr. Volk's report should be excluded, and even if the Court considers Mr. Volk's report, Defendant does not have

11

"admissible expert testimony or other evidence" showing either "substantially equivalent jobs existed" with "comparable compensation, benefits, responsibilities, and status" or "class members could have obtained such positions." (Dkt. No. 173 at 8-11.) Although the Court excludes Mr. Volk's opinions about the duty to mitigate, Defendant responds evidence outside of Mr. Volk's report permits an inference substantially equivalent jobs were available. Specifically, Defendant points to (1) Bureau of Labor Statistics Data in Dr. Petersen's report and (2) class members' deposition testimony. The Court agrees evidence in Dr. Petersen's report[3] and Plaintiffs' deposition testimony permit an inference there were substantially equivalent jobs which Plaintiffs could have obtained.

First, to estimate class members' projected earnings, Dr. Petersen reviewed "data on wages and employment of Flight Attendants from the U.S. Bureau of Labor Statistics" and "performed a labor market supply and demand analysis for flight attendants in the U.S." (Dkt. No. 172-2 at 4.) Defendant attaches a table from Dr. Petersen's report illustrating the supply and demand analysis, which estimates the "total job openings per year" for flight attendants between "2024-34" as "19,800." (Dkt. No. 186-5 at 2; *see also* Dkt. No. 186-3 at 8:21-25 (testifying "19,800 [… is] the

---

[3] Plaintiffs emphasize Defendant does not have "admissible expert testimony" regarding substantially equivalent employment. (Dkt. No. 173 at 8-11.) But "[a]t the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). The Court considers Dr. Petersen's report as part of Defendant's evidence because Defendant can conceivably admit at least some of the Bureau of Labor Statistics data through examination of Dr. Petersen.

Relatedly, Defendant requests judicial notice of the Bureau of Labor Statistics data, and in particular the government's projections of annual flight attendant openings. (Dkt. No. 187.) Defendant's request instructs the Court, step-by-step, how to download data from the Bureau of Labor Statistics' website, open it in spreadsheet form, and interpret the voluminous spreadsheet to ascertain the average number of projected job openings in years that Dr. Petersen's supply-and-demand analysis did not examine. (*See generally id.*) For instance, Defendant requests the Court take judicial notice of counsel's "summary" of the data, *i.e.*, interpreting numbers found in "row 999" and "row 1060" of the spreadsheet. (*Id.* at 10.) The Court denies Defendant's request as improper. While government websites may be judicially noticed, even if a "document itself is susceptible to judicial notice[, that] does not mean that every assertion of fact within that document is judicially noticeable for its truth." *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). Data points buried deep in agency-produced spreadsheets are not "generally known within the trial court's territorial jurisdiction" and cannot "be accurately and readily determined," Fed. R. Evid. 201(b)(1), (2), because data analysis of this sort requires some degree of sophistication, personal knowledge, or expertise.

annual … demand over 10 years. So, that would be the total expected job openings per year.")) Recall Dr. Petersen did not opine as to whether there was substantially equivalent employment available to class members.  Nonetheless, based on this job openings estimate, Defendant argues "the sheer volume of available positions" for flight attendants alone "may be sufficient to establish that 'substantially equivalent' employment was available." (Dkt. No. 186 at 16-17.)

Second, some class members testified they saw or found flight attendant job openings after their termination.  At her deposition in September 2025, Valerie Barajas testified United "recently […] had a job opening window for inflight," although she did not apply because her passport was set to expire soon, which meant she did not meet one of the job requirements.  (Dkt. No. 186-6 at 15:16-16:21.)  Alexander McCall Smith testified she obtained a full-time flight attendant job where she earned more on an hourly basis than she did at Southwest.  (Dkt. No. 186-10 at 16:17-17:24.)  And Victoria Paige Mack "found a SkyWest flight attendant position" in December 2025. (Dkt. No. 186-11 at 18:10-19:9.)  At the time, she was "trying to find comparable airlines to Southwest," meaning "comparable start pay, schedules, unionized, training times, aircraft fleet … anything that I'm used to or similar size or airline[.]" (*Id.*)

Drawing inferences in Defendant's favor, the Bureau of Labor Statistics data and class members' testimony permit an inference there were substantially equivalent jobs which Plaintiffs could have obtained.  All terminated class members, by definition, were flight attendants, and in each year between 2024 and 2034, there were roughly 19,800 job openings for the flight attendants nationwide.  Given those openings are for the same kind of job Plaintiffs previously had, Defendant's argument here is not "essentially … reduced to the proposition that [Plaintiffs] should consider" "another line of work." *See Pape Lift*, 115 F.3d at 687 (citing *Ford Motor*, 458 U.S. at 231).  That said, Plaintiffs are correct Dr. Petersen's analysis does not set forth these roles' pay, location, or other factors which would bolster Defendant's argument these roles are "substantially equivalent" to Plaintiffs' jobs at Southwest. (*See generally* Dkt. No. 172-2 at 4; Dkt. No. 186-5 at 2; *see, e.g.*, Dkt. No. 186-7 at 25 (testifying "I felt my worth was minimum $20 an hour.")) But Plaintiffs' own evidence suggests a high volume of job openings for flight attendants–19,800 per year.  The sheer volume of openings, coupled with testimony at least some

13

class members saw flight attendant openings or obtained flight attendant positions with similar pay and benefits, permits an inference there were "substantially equivalent" jobs which Plaintiffs could have obtained.  (*See, e.g.*, Dkt. No. 186-10 at 16:17-17:24 (testifying she obtained a full-time flight attendant job with better hourly wages than Southwest); Dkt. No. 186-11 at 18:10-19:9 (testifying she saw a flight attendant opening while looking for positions which are "comparable" in "start pay, schedules," unionization, and other factors she was "used to" at Southwest)).  Therefore, class members are not necessarily "accept[ing] a demotion" or taking "significantly lower pay." *Pape Lift*, 115 F.3d at 687.  So, drawing inferences in Defendant's favor, Plaintiffs have not shown, as a matter of law, Defendant's affirmative defense must be dismissed on the basis no reasonable trier of fact could find there were no substantially equivalent jobs which Plaintiffs could have obtained.

Plaintiffs' insistence Defendant must identify specific openings "offering virtual identical promotional opportunities, compensation, working conditions, and status" (Dkt. No. 193 at 6) is unavailing.  Plaintiffs cite several district court cases as stating jobs are "substantially equivalent" when the jobs have "virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status."  (*Id.* at 6-9) (cleaned up).  But the Ninth Circuit has not held that is the rule.  Plaintiffs rely on cases which "cit[e] *Odima*" and "apply[] the *Odima* standard" (*see generally id.*), but *Odima* does not say anything about what constitutes "substantially equivalent" employment.  *See* 53 F.3d at 1496–97.  Rather, *Odima* stated there is "no Ninth Circuit authority" for the argument "[i]f an employer proves that a plaintiff failed to look for work, the employer is not required to prove that jobs were available." *Id.* at 1497 (cleaned up).  So, if anything, *Odima* merely re-affirmed the failure to mitigate defense has two elements, and the employer must prove both.  The Court therefore declines to adopt the "virtually identical …" language some district courts have applied.  *See, e.g.*, *Cheeks v. General Dynamics*, 22 F. Supp. 3d 1015, 1027 (D. Ariz. 2014); *Brown v. Riverside Elementary School District No. 2*, 2024 WL 474528, at *5 (D. Ariz. Feb. 7, 2024); *Hughes v. Mayoral*, 721 F. Supp. 2d 947, 967–68 (D. Haw. 2010).

Consider, for instance, Plaintiffs' reliance on *Cheeks*, which held jobs are "substantially

United States District Court
Northern District of California

14

equivalent" when they have "virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status." 22 F. Supp. 3d at 1027–28 (cleaned up). The "virtually identical" language came from another district court case, *Cassella v. Mineral Park, Inc.*, 2010 WL 454992, at *5 (D. Ariz. Feb. 9, 2010), which borrowed the standard from the Fifth Circuit. *Id.* (quoting *Sellers v. Delgado College*, 902 F.2d 1189, 1193 (5th Cir. 1990)). And even under that standard, *Cheeks* reached the same conclusion as this Court on a similar evidentiary showing by the employer. There, the employer produced "job search results" showing "dozens of potentially equivalent available jobs," but the search results "consist[ed] only of job titles, employers, and locations." 22 F. Supp. 3d at 1027, 1028 n.14. Based on "the sheer number of jobs specifically responsive to Plaintiff's own search parameters," *Cheeks* held it is "reasonable to infer that at least one of the dozens of potentially equivalent jobs may have been, in fact, equivalent to Plaintiff's previous position[. …] Thus, […] at the summary judgment stage where all reasonable inferences must be made in favor of the non-movant, [Defendant]'s failure to proffer detailed descriptions of the jobs is not fatal." *Id.* at 1027-28. Admittedly, unlike *Cheeks*' evidence, Dr. Petersen's report does not show the employers or locations of the job openings. (Dkt. No. 186-5 at 2.) But the "sheer number of … potentially equivalent jobs" here (roughly 19,800 per year) is exponentially higher than the "dozens" of potentially equivalent jobs in *Cheeks*. (*See id.*); 22 F. Supp. 3d at 1027–28 & n.14. And here, some class members testified they obtained, and/or saw openings for, flight attendant jobs with similar employers. Therefore, it is "reasonable to infer that at least one of the [19,800] potentially equivalent jobs may have been, in fact, equivalent to Plaintiff[s'] previous position[.]" *Cheeks*, 22 F. Supp. 3d at 1028.

Accordingly, the Court denies Plaintiffs' motion for partial summary judgment.

## CONCLUSION

As explained above, the Court excludes the portions of Mr. Volk's report that discuss class members' failure to mitigate damages and denies Plaintiffs' motion for partial summary judgment.

This Order disposes of Docket Nos. 172 and 173.

**IT IS SO ORDERED.**

Dated: June 10, 2026

15

JACQUELINE SCOTT CORLEY
United States District Judge