JASON M. ERLICH, Bar No. 203661
Email: jason@erlichlawfirm.com
JOHN ECKERT, BAR NO. 344872
Email: john@erlichlawfirm.com
ERLICH LAW FIRM, P.C.
180 Grand Ave., Suite 1380
Oakland CA 94612
Tel: (510) 390-9140
Fax: (510) 369-3876

Jennie Lee Anderson, Bar No. 203586
Email: jennie@andrusanderson.com
ANDRUS ANDERSON LLP
1970 Broadway, Suite 1070
Oakland, CA 94612
Tel: (415) 986-1400
Fax: (415) 986-1474

Attorneys for the Certified Classes and Class Representatives RORESTE REFUERZO and SELINA CASHIN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RORESTE REFUERZO and SELINA CASHIN, on behalf of themselves and others similarly situated,

Plaintiffs,

vs.

SOUTHWEST AIRLINES CO.,

Defendant.

Case No. 3:22-cv-00868-JSC

**PLAINTIFFS' OPPOSITION TO DEFENDANT SOUTHWEST AIRLINE CO.'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

Date: August 26, 2026
Time: 10:00 a.m.
Location: Courtroom 8, 19th Floor
Phillip Burton Federal Building
450 Golden Gate Avenue
San Francisco, CA 94102

## TABLE OF CONTENTS

I. INTRODUCTION ........ 1

II. FACTUAL AND PROCEDURAL BACKGROUND ........ 2

A. Southwest Unilaterally Changed Its FMLA Policy Effective March 1, 2019 ........ 2

B. Under the Subject Policy, Southwest Treated Protected FMLA Leave as a 'Chargeable Occurrence' That Forfeits Record Improvement. ........ 3

C. Southwest Relied on the *Dyer* Trial Court Decision in Justifying Its Unilateral Policy Change to the Department of Labor, but Left the Policy in Place When That Decision Was Reversed by the Circuit Court. ........ 3

D. The 2024 Collective Bargaining Agreement. ........ 5

III. LEGAL STANDARD ........ 6

IV. ARGUMENT ........ 6

A. Southwest's Global Merits Attack Exceeds the Narrow Grant of Leave to File an Untimely Motion. ........ 6

B. The Eleven Challenged Class Members Have Article III Standing and Raise Issues of Disputed Fact Regarding Their Terminations. ........ 6

1. *Healy* applies ordinary Rule 56 standards to standing. ........ 6

2. Ms. Rea's litigation-created reconstructions are not competent evidence and cannot carry Southwest's summary-judgment burden. ........ 8

3. Even if Ms. Rea's counterfactuals and hypotheticals were admissible, the record raises a genuine dispute as to each of the eleven challenged members. ........ 11

4. The roll-off-erasure theory contradicts Southwest's theory as to why its policy did not violate the FMLA. ........ 15

5. The motion does not reach the injunctive classes. ........ 15

6. Mitigation does not deprive Ms. Littles or Ms. Smith of standing. ........ 15

C. Natalie Patterson Should Not Be Dismissed on Summary Judgment. ........ 16

D. Southwest Is Not Entitled to Judgment That Its Policy Is Lawful. ........ 17

1. Southwest violates the FMLA by using protected leave as a negative factor under a no-fault attendance policy. ........ 18

2. The Subject Policy Does Not Apply a Permissible Freeze. ........ 19

3. Southwest's Other Rhetorical Arguments Are Equally Unavailing. ........ 21

4. The CFRA, wrongful-termination, and UCL claims survive with the FMLA claim. ........ 23

V. CONCLUSION ........ 23

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) .................................................. 6, 10, 16

*Axelrod v. Lenovo (U.S.) Inc.*, No. 21-cv-06770-JSW, 2026 WL 1270792, at *1 (N.D. Cal. Apr. 6, 2026) .................................................. 15

*Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001) .................................. 18, 19

*Bailey v. Pregis Innovative Packaging, Inc.,* 600 F.3d 748 (7th Cir. 2010) .................................. 3, 18

*Behar v. Northrop Grumman Corp.*, No. 2:21-CV-03946-HDV-SK, 2026 WL 184300, at *8 n.10 (C.D. Cal. Jan. 20, 2026 .................................................. 7

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) .................................................. 6, 16

*Christensen v. Harris Cty.*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) ................ 20

*Dyer v. Ventra Sandusky, L.L.C.*, 317 F. Supp. 3d 953 (N.D. Ohio 2018) .......................... 3, 4, 18, 19

*Dyer v. Ventra Sandusky, LLC*, 934 F.3d 472, 476-477 (6th Cir. 2019) .................................... passim

*FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) .................................... 10

*Healy v. Milliman, Inc.*, 164 F.4th 701, 708 (9th Cir. 2026) .................................................. 7, 15

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) ...................... 9

*Olson v. United States*, 980 F.3d 1334, 1338 (9th Cir. 2020) .................................................. 18

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) ........................................ 10

*TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) .................................................. 6, 15

*United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997) .......................................... 9

*Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) ...................................... 10

*Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1133–35 (9th Cir. 2003) ........................................ 19, 23

## Statutes

Fed. R. Civ. P. 25 .................................................. 17

Fed. R. Civ. P. 56(a) .................................................. 6, 8, 9, 16

Fed. R. Evid. 602 .................................................. 8

Fed. R. Evid. 701(a) .................................................. 8

**Other Authorities**

29 U.S.C. § 2611 .......... 18

29 U.S.C. § 2614 .......... 18, 22

29 U.S.C. § 2615 .......... 18

**Regulations**

29 C.F.R. § 825.215 .......... 18, 22

29 C.F.R. § 825.220 .......... 18

## I. INTRODUCTION

Since the *Dyer* v. *Ventra Sandusky* decision came down in 2019, Southwest has been on notice that its policy runs afoul of the FMLA. Perhaps for this reason, it failed to move for summary judgment by the deadline for dispositive motions. In its order denying decertification, the Court granted Southwest leave to file this motion, but narrowed its scope "to specific class members." (Dkt. No. 197 at 13:13–14.) Southwest moves on three grounds: (1) that its record-improvement policy does not violate the FMLA as a matter of law; (2) that eleven class members lack Article III standing to pursue termination-based claims or damages; and (3) that Natalie Patterson should be dismissed because she was not deposed before her death.

The first ground reaches well past the narrow leave the Court granted, attempting to relitigate an issue the Court has already addressed at multiple stages: whether the policy's legality presents a triable issue. It does. In arguing to the contrary, Southwest once again asks the Court to approve its treatment of protected FMLA leave as a chargeable occurrence, and once again it cannot. Southwest's own 30(b)(6) witness, Catherine Rea, confirmed that the company treats the taking of FMLA leave as a chargeable occurrence under its attendance and disciplinary policies. This, plainly, constitutes a negative consequence to the exercise of a protected right, in violation of the FMLA's regulations and the Ninth Circuit's negative-consequence test. Faced with that record, Southwest relies on characterizations that obscure how the policy actually operated, chief among them the claim that its policy is a permissible "freeze" rather than a forfeiture. But a freeze, as the Department of Labor and the Sixth Circuit in *Dyer* use the term, pauses a benefit and later restores it; Southwest's policy, in contrast, destroys it. Southwest's global merits attack is both beyond the leave it was granted and fails on the merits.

Southwest's standing challenges for eleven individual (b)(3) class members fail for three reasons. ***First***, the motion improperly relies on unsubstantiated assumptions and hypotheticals proffered by a lay witness rather than on admissible evidence. ***Second***, even taken at face value, the reconstruction is a self-serving declaration by Southwest's own witness that contradicts Southwest's own contemporaneous records, and its credibility is for the jury—not the Court—to weigh. ***Third***, Southwest's claims that these eleven class members "would have been fired anyway" are based on

disputed facts. As explained below, each explanation Southwest proffers is countered by other evidence from which a jury could conclude that the class member in question ***was*** terminated because they used FMLA leave.

Finally, Southwest argues that Natalie Patterson should be dismissed because "Plaintiffs cannot demand individualized termination damages while withholding the discovery Southwest needs to test them." (Mot. at 6:22–23.) But dying, as Ms. Patterson sadly did, and withholding discovery aren't remotely the same thing, and Southwest identifies no authority for the premise that Ms. Patterson's estate cannot proceed with her claims.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Southwest Unilaterally Changed Its FMLA Policy Effective March 1, 2019.

In its motion, Southwest asserts that "the CBA sets the conditions for" Southwest's record-improvement policy. (Mot. 15:3-4.) It goes on: "Applying the statute to the terms of the CBA is the Court's task alone. There is nothing here for a jury to find." (*Id*. at 15:9-10.) This obscures the fact that the subject policy was unilaterally promulgated by Southwest.

Before March 1, 2019, Southwest did not disqualify flight attendants taking intermittent FMLA leave from quarterly record improvement. (Dkt. No. 139-6, Rea April 2023 Dep. at 19:12–16.) Southwest announced its policy change by email without any deliberation with the union. (*See* Dkt. No. 139-4, Policy Change Announcement Email.) Prior to the policy change, Southwest disqualified flight attendants taking continuous FMLA leave from all quarterly and monthly record improvement, but after the policy change, on March 1, 2019, flight attendants taking even one day of FMLA leave were disqualified from all four mechanisms of quarterly and monthly record improvement. (Erlich Decl., Ex. A, Dkt. No. 139-7, Defendant's First Supplemental Responses to Plaintiff's Requests for Admissions; *see also* Dkt. No. 139-4 at SWA_000324 ("It will no longer matter whether the Employee is on continuous or intermittent FMLA leave").)

The subject policy was not collectively bargained. No one from the union was involved in the policy change in March 2019 and it was instead developed by two members of Southwest's inflight team—Catherine Rea and Wayne Shaw—and two members of Southwest's legal department, Chris Maberry and Tammy Shaffer. (Erlich Decl., Ex. B, Rea Apr. 2023 Dep. at 30:4-31:13.)

The Court has already recognized the extra-contractual character of the subject policy. Over four years ago, the order denying Southwest's motion to dismiss noted: "Tellingly, the March 2019 rule under which a flight attendant's use of intermittent FMLA leave disqualifies him from record improvement is not in the CBA." (Dkt. No. 25 at 6:14-15.)

**B. Under the Subject Policy, Southwest Treated Protected FMLA Leave as a 'Chargeable Occurrence' That Forfeits Record Improvement.**

Southwest's attendance system is a no-fault points regime, and "record improvement," which is the removal of accumulated points through three quarterly and one monthly point-reduction benefits.[1] If flight attendants have what is called a "chargeable occurrence" during a quarter or month, they are barred from all quarterly and monthly benefits. Under the subject policy, Southwest treated taking FMLA leave as a chargeable occurrence. (Erlich Decl., Ex. C, Rea Apr. 2024 Dep. at 32:19-25; *see also* Erlich Decl., Ex. A, Dkt. No. 139-7 (RFA Responses) (even one day of FMLA leave disqualified flight attendants from all four quarterly and monthly record improvement benefits).)

**C. Southwest Relied on the *Dyer* Trial Court Decision in Justifying Its Unilateral Policy Change to the Department of Labor, but Left the Policy in Place When That Decision Was Reversed by the Circuit Court.**

In justifying the subject policy in a March 5, 2019 letter to the Department of Labor ("DOL"), Southwest cited to the District Court's order in *Dyer v. Ventra Sandusky, L.L.C.*, 317 F. Supp. 3d 953 (N.D. Ohio 2018), noting that it "held that an employer may disqualify an employee from an attendance bonus for taking FMLA leave." (Dkt. No. 139-5 at SWA_000767.) The *Dyer* trial court decision encompassed a view of *Bailey v. Pregis Innovative Packaging, Inc.,* 600 F.3d 748 (7th Cir. 2010) and FMLA interference law that Southwest has clung to and reiterated up through and including this motion. Southwest told the DOL that *Bailey* "concluded that an employee on FMLA leave cannot 'accrue benefits that accrue only by working.'" (*Id.,* quoting *Bailey* at 752.) It told the DOL that the trial court in district-court *Dyer* "went even further," and Southwest justified the subject policy under its reasoning:

> In *Dyer*, the employer had a policy that allowed an employee to reduce their attendance points by achieving perfect attendance for thirty days. FMLA leave was not counted as

[1] No Chargeable Occurrences During A Quarter, Perfect Attendance During a Quarter, Fourth Quarter Record Improvement Bonus, and the December Record Improvement Bonus. See Dkt. No. 139-3.

> time worked towards 30-day streak, and "reset" the perfect attendance clock. "For example, if an employee worked three days, took the fourth day off for an FMLA qualifying purpose, and returned to work on the fifth, his attendance streak restarted at one day worked, rather than four." *See id*. at 954-55. The plaintiff in *Dyer* argued that he faced "inevitable termination as points accumulate and never come off due to his use of intermittent FMLA leave," which seems analogous to the concerns you mentioned on our phone call last week. The court, however, agreed with the employer that the point removal policy is a benefit that employees earn for working, and did not violate the FMLA. 317 F. Supp. 3d at 957-61 (finding no FMLA violation because the employer "does not impose discipline for FMLA leave," such as by "add[ing] points for absences when an employee uses FMLA leave," but only withholds "absenteeism forgiveness" that is a reward for working (citing 29 C.F.R. § 825.215(d)(2); *Bailey*, 600 F.3d at 752)). *Dyer* thus supports Southwest's practice regarding quarterly record improvement ….[2] *Dye*r likewise supports Southwest's practice regarding disqualification from various attendance bonuses, which remove points from employees' attendance records as a reward for good attendance.

(Dkt. 139-5 at SWA_000767.)

Years before this case was filed in 2022, the Sixth Circuit reversed the trial court decision in *Dyer* and rejected the arguments Southwest relied upon. Applying the Ninth Circuit's negative-consequence test, the court of appeals reversed the trial court's grant of summary judgment, reasoning that the practical result of losing point reductions for taking FMLA is the same as being assigned disciplinary points:

> Resetting Dyer's perfect-attendance clock every time he took FMLA leave effectively denied him the flexibility of the no-fault attendance policy that every other employee not taking FMLA leave enjoyed. Dyer was prejudiced by Ventra Sandusky's policy because his ability to remain employed hinged on his not taking FMLA leave. And in fact Dyer was eventually fired due to his inability to achieve "perfect attendance" and thereby reduce his total points. Therefore, a jury could reasonably find that forcing Dyer to choose between taking needed FMLA leave and enjoying the bargained-for terms of his employment relationship improperly interfered with his FMLA rights. See 29 U.S.C. § 2615(a)(1); 29 C.F.R. § 825.220(b) ("Interfering with the exercise of an employee's [FMLA] rights [ ] includes ... discouraging an employee from using such leave."). Although the policy here does not formally hinge point reduction on not taking FMLA leave, the practical result is the same for someone like Dyer who must take frequent intermittent FMLA leave.

*Dyer v. Ventra Sandusky, LLC*, 934 F.3d 472, 476-477 (6th Cir. 2019).

The circuit court also rejected the trial court's interpretation of *Bailey*, and harmonized that decision with its own ruling:

---

[2] In the deleted portion of this passage, Southwest argues that its policy is "more generous" than the one in *Dyer*, but as the Plaintiffs have demonstrated repeatedly, the subject policy is significantly more draconian than the one in *Dyer*, as flight attendants can lose up to 90 days accrued toward point-reduction benefits for taking protected FMLA leave. By contrast, in *Dyer* one month was the most accrued days an employee could lose for taking leave. (*See* Dkt. No. 139 at 16:9-17:6.)

> Based on the language of the Act and the Department of Labor regulations, point reduction can be viewed as an employment benefit, the accrual of which, like the accrual of other benefits or seniority, must be available to an employee upon return from leave. See 29 U.S.C. § 2614(a)(2). The regulations state that "[a]t the end of an employee's FMLA leave, benefits must be resumed in the same manner and at the same levels as provided when the leave began." 29 C.F.R. § 825.215(d)(1). Whereas an employee is not entitled to "accrue any additional benefits or seniority during unpaid FMLA leave[,] [b]enefits accrued at the time leave began ... must be available to an employee upon return from leave." Id. § 825.215(d)(2). The FMLA defines "employment benefits" expansively to mean "all benefits provided or made available to employees by an employer, including ... sick leave, [and] annual leave," whether provided by practice or written policy. See 29 U.S.C. § 2611(5). Point reduction fits within this definition, because it is both a benefit Ventra Sandusky affords its employees to flexibly manage their absences, and because the reduction of a point effectively awards an additional day of allowed absence, akin to awarding sick leave. Consistent with this approach, the Seventh Circuit has held that "wiping a point off the absenteeism slate is indeed an employment benefit." *Bailey v. Pregis Innovative Packaging, Inc*., 600 F.3d 748, 750–51 (7th Cir. 2010). In other words, Dyer's FMLA leave could freeze the accrual of attendance but could not reset it; upon returning, Dyer was entitled to the days of attendance he had accrued when leave began and to continue accruing them in the same way.

*Id*. at 477.

This passage is notable not just because it rejected an erroneous reading of *Bailey* that Southwest still clings to, but also because it rejects the interpretation of the term "freezing" that Southwest similarly continues to misconstrue. In any event, despite Southwest's attentiveness to a district court decision in Ohio, it made no corresponding policy change when that decision was roundly rejected by the Sixth Circuit. (Erlich Decl., Ex. A, Dkt. No. 139-7 (RFA Responses).)

**D. The 2024 Collective Bargaining Agreement.**

After Plaintiffs filed this case and the Court denied Defendant's motion to dismiss, Southwest and the union agreed that intermittent FMLA leave would no longer disqualify a flight attendant from two forms of record improvement (the No Chargeable Occurrences and Fourth Quarter bonuses). (Dkt. No. 221-2, ¶34 (the new CBA was effective as of May 1, 2024).) But of course, the union should not have to bargain to make Southwest's policies less violative of the FMLA. For example, during the negotiations for the new contract flight attendants lost the 16 Month Roll Off benefit.[3] (*Id*.)

---

[3] The bygone 16 Month Roll Off was not part of Plaintiffs' allegations, but it is noteworthy because Southwest applied a freeze to it in the sense that is permissible under the FMLA. (*Compare* Dkt. No. 139 at SWA_000765 (describing the policy change with respect to the 16 Month Roll Off), *with* 1999 FMLA Ltr. at 2, 1999 WL 1002428 ("If the employee had 45 days without a recordable

## III. LEGAL STANDARD

Summary judgment is proper only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor; it may not weigh evidence or make credibility determinations. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). As the moving party, Southwest bears the burden of showing the absence of a genuine dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b).

## IV. ARGUMENT

### A. Southwest's Global Merits Attack Exceeds the Narrow Grant of Leave to File an Untimely Motion.

Southwest missed the deadline for dispositive motions by several months. The Court granted Southwest leave to file this untimely motion only "as to specific class members." (Dkt. No. 197 at 13:13-14.) Accordingly, the first branch of Southwest's motion, which asks the Court to grant summary judgment on the basis that the subject policy complies with the FMLA, must be denied as untimely and beyond the scope of the Court's grant of leave. Even if the Court were to grant a second leave to bring an untimely motion, this time with unlimited parameters, Southwest still falls far short of showing entitlement to summary judgment on substantive grounds.

But Plaintiffs begin by addressing issues the Court granted Southwest leave to raise before addressing the previously-rejected arguments not properly brought before the Court.

### B. The Eleven Challenged Class Members Have Article III Standing and Raise Issues of Disputed Fact Regarding Their Terminations.

1. <u>*Healy* applies ordinary Rule 56 standards to standing.</u>

Article III requires a concrete injury fairly traceable to the challenged conduct and redressable by the court. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). In denying decertification, this Court already identified the standard that governs Southwest's challenge: "Plaintiffs must adduce evidence sufficient to support a finding [that] class members have standing," and *TransUnion*

incident at the time the unpaid FMLA leave commenced, the employer would be obligated to restore the employee to this number of days credited without an incident").) Thus, the 16 Month Roll Off showed that Southwest knows how to do a permissible freeze when it chooses.

"compels unnamed class members to demonstrate evidence of standing here—after class certification but prior to trial at summary judgment" (Dkt. 197 at 3:22-25, citing *Healy v. Milliman, Inc.*, 164 F.4th 701, 708 (9th Cir. 2026).) The Court defined that burden with precision: unnamed members need only "produce evidence of standing at summary judgment enough to establish 'a genuine question of material fact as to the standing elements.'" (*Id*. at 4:10-13, quoting *Behar v. Northrop Grumman Corp*., No. 2:21-CV-03946-HDV-SK, 2026 WL 184300, at *8 n.10 (C.D. Cal. Jan. 20, 2026).)

*Healy* confirms that, when assessing standing, "the usual summary judgment standards apply," that a plaintiff "can use either direct evidence or circumstantial evidence," and that a member need only "produce enough evidence … that a rational trier of fact could reasonably infer" the injury. 164 F.4th at 703, 709–710. *Healy* drove the point home by reversing a grant of summary judgment: the district court erred as a matter of law when it demanded "direct evidence of concrete injury on a class-wide basis" and imposed "an unduly high burden" by asking whether the evidence "necessarily" established injury. *Id*. at 710. On this motion, then, every reasonable inference is drawn in Plaintiffs' favor, and the question is not whether Plaintiffs have proven standing but whether a reasonable jury could find it.

Southwest's motion, in contrast to that standard, asks the Court to accept, as "undisputed," its declarant's counterfactual reconstruction that each member would have been terminated regardless, and to treat that reconstruction as conclusively defeating standing. (Mot. at 16:9-11.) That is precisely the "unduly high burden" *Healy* forbids.

The baseline injury is the denied benefit of record-improvement that each class member, including the eleven challenged here, lost points because they took FMLA leave. Southwest concedes point-reductions are an "employment benefit under the FMLA." (Mot. at 5:27-28). Southwest's own point calendars show, quarter by quarter, the reductions these members would have received but for the challenged policy. (Dkt. No. 221-2, Rea Decl. ¶¶ 22–32, citing Exs. B-L (bracketed "adjusted" balances reflecting the reductions that were lost).)[4]

---

[4] Southwest's reliance on *Takhar v. Kessler*, 76 F.3d 995 (9th Cir. 1996) is unavailing. The injury in *Takhar* was traceable to an independent source the plaintiff had not challenged. *Id*. at 1001. Here the reverse is true: no independent source denied these members their record improvement reduction—only the challenged FMLA policy did, so the lost-benefit injury is traceable to that policy alone.

2. Ms. Rea's litigation-created reconstructions are not competent evidence and cannot carry Southwest's summary-judgment burden.

Southwest argues that, even crediting the lost reductions, each of the challenged members would have reached 12 points and been subject to termination "at the same time or earlier." (Mot. at 16:27-28.) These conclusions rest entirely on Ms. Rea's declaration, which purports to reconstruct what each challenged member's point balance "would have been" had the member not taken FMLA leave.

However, at her deposition, Ms. Rea repeatedly admitted that these reconstructions are not accounts of what happened, but assumptions and hypotheticals she built for this litigation. She agreed that her analysis is not an historical summary of what happened, noting "[i]t's an assumption." (Erlich Decl., Ex. D, Rea June 25, 2026 Dep at 33:12–16; *Id*. 32:13–14.) She agreed the "recalculated points were not the actual point totals in Southwest['s] system at the time of [the members'] termination," but only "adjusted point totals for th[e] hypothetical assumption" she made. (*Id*. 33:4–11.) And she agreed that her ultimate conclusion—that a class member would have been terminated regardless—"is not what happened at the time Southwest terminated somebody." (*Id*. 33:24–34:10; *see id*. 35:4–8 (analysis "[l]eads to a conclusion that is not based on what actually happened").) Her declaration says the same, framing each reconstruction with "if we assume." (Dkt. No. 221-2 ¶ 16.)

Unsupported counterfactual assumptions and speculative reconstructions that are not grounded in the declarant's personal knowledge or based on admissible evidence cannot establish an undisputed fact on summary judgment. A declaration must be "made on personal knowledge" and "set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4). A witness may testify to a matter "only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter," Fed. R. Evid. 602, and a lay opinion must be "rationally based on the witness's perception," Fed. R. Evid. 701(a). Ms. Rea's reconstructions meet none of these requirements because—by her own admission—they describe a counterfactual world, or arise from "policies" that appear nowhere in the written record and/or about which counter evidence shows do not operate in the manner Ms. Rea asserts in her declaration. (*See* Erlich Decl., Ex. D, at 19:16-20:19, 30:20–23; 40:6-41:14, 45:6-20.)

To the extent the reconstructions are not simply speculative but the product of applying

Southwest's attendance rules—and Ms. Rea's own uncorroborated code classifications—to build hypothetical balances, they are inadmissible lay testimony. These are not opinions "based on … specialized knowledge within the scope of Rule 702," which Rule 701(c) removes from the category of lay testimony. "Lay witness testimony is governed by Rule 701, which limits opinions to those 'rationally based on the perception of the witness,'" while opinion that instead "require[s] demonstrable expertise" is "precisely the type of 'specialized knowledge' … governed by Rule 702." *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997); *accord Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008). The 2000 amendment to Rule 701 added subsection (c) precisely so that a party could not "evade the expert witness disclosure requirements … by simply calling an expert witness in the guise of a layperson." Fed. R. Evid. 701 advisory committee's note to 2000 amendment. Southwest never disclosed Ms. Rea as an expert under Rule 26(a)(2). Her reconstruction opinions are therefore subject to exclusion under Rule 37(c)(1), and at summary judgment the Court may consider only evidence that would be admissible at trial. Fed. R. Civ. P. 56(c)(2).

The unreliability of Ms. Rea's declaration is compounded by Ms. Rea's admission that neither her code classifications nor her conclusions rest on any Southwest policy. She conceded there is no written policy identifying the attendance codes she catalogs or their consequences, that she "did not attach a written policy, or any documents" to support them, and that the codes "depend[] on [her] understanding of how Southwest applies these codes." (Erlich Decl., Ex. C at 12:6–13:3.) Pressed, for example, on a specific classification—that a "Los Angeles Sick Kin Care" ("LSCK") code defeated a member's perfect-attendance improvement—she could identify no supporting "policy in writing," answering only that "it is possible" and that she "would … have to do a little research." (*Id.* 50:13–24.) An opinion whose classifications and conclusions rest on unwritten, unverified personal understanding—layered atop admitted assumptions—cannot establish an undisputed fact.

These deficiencies are decisive because Southwest, as the moving party, bears the burden of establishing the absence of any genuine dispute, and it attempts to carry that burden through Ms. Rea's declaration alone. A "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *FTC v. Publ'g Clearing House,*

*Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997). The Ninth Circuit has "refused to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). Ms. Rea's reconstructions are the paradigm of such testimony: uncorroborated by any written policy, admittedly assumption-driven, and—most tellingly—contradicted by Southwest's own contemporaneous records.

Ms. Rea's treatment of Personal Leave with No Pay illustrates the problem. Her declaration counts LVNP (also coded LVN) as a chargeable occurrence that defeated Record Improvement for class members Cierra Brooks and Colleen Church. (Dkt. No. 221-2, ¶¶ 28(f), 31(b).) Yet Southwest's own contemporaneous Quick Reference Chart classifies that same personal-leave code as non-chargeable (Dkt. 139-3), and at deposition Ms. Rea admitted that LVN and LVNP are the same code and that the chart classified it as non-chargeable. (Erlich Decl., Ex. D, Rea Dep. 12:6–13:17; 44:1–48:1.) Only after her deposition did Ms. Rea assert, for the first time, that the charts had been "incorrect" for years. (Dkt. No. 221-2, ¶¶ 36–37 & Exs. O–P.) A declaration that contradicts the movant's own contemporaneous policy documents does not remove a factual dispute; it supplies one.

At bottom, Southwest asks the Court to enter judgment on the strength of its own interested witness's declaration—crediting Ms. Rea's litigation account over the contemporaneous documents that recorded the policy as Southwest administered it, wherever those documents prove inconvenient. Rule 56 forbids that resolution. On a motion for summary judgment the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe," and may credit a movant's supporting evidence only to the extent it "is uncontradicted and unimpeached" and "comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); accord *Anderson*, 477 U.S. at 255. Ms. Rea's reconstructions satisfy none of those conditions: she is Southwest's own declarant, and her account is both contradicted by Southwest's contemporaneous records and impeached by her deposition admissions. Whether to believe her is therefore a question for the jury that defeats summary judgment. Faced with Ms. Rea's admissions and contradictions, reasonable jurors may reject the contents of her declaration as an interested, after-the-fact reconstruction reverse-engineered to fit Southwest's litigation positions, rather than a truthful account.

//

3. <u>Even if Ms. Rea's counterfactuals and hypotheticals were admissible, the record raises a genuine dispute as to each of the eleven challenged members.</u>

**Nicole Littles**. Ms. Rea concedes that Ms. Littles, the first class member she analyzed, took intermittent FMLA in Q1 2019 and that it cost her a two-point record-improvement reduction. (Dkt. No. 221-2, ¶ 22(a).) Southwest's "terminated regardless" showing then treats a June 26 No Show ("NS") worth 2.5 points as a valid attendance event. (*Id.*, ¶ 22(b).) But Ms. Littles testified that she had never been told she received this NS and that Southwest confiscated her flight badges and credentials at a June 25 fact-finding meeting, leaving her unable to check in, clear secure areas, or board a plane and work on June 26. (Erlich Decl., Ex. E, Littles Dep. 38:25–41:20, 99:17–101:18.) Ms. Rea's counterfactual is internally inconsistent: it erases the point balance that prompted Southwest to pull Ms. Littles's credentials but keeps the no-show that occurred only because Southwest had already made her unable to work. Crediting the Q1 reduction, or Littles's testimony, leaves her at 11.5 points, and a jury could so find.

**Jonathan Harden**. Ms. Rea admits Mr. Harden's Q3 2019 FMLA cost him a two-point reduction, and that in Q1 2020 he had no attendance events at all, yet was denied the perfect attendance record improvement solely because he took intermittent FMLA. (Dkt. No. 221-2, ¶ 23(c), (e).) That reasoning simply invokes the challenged policy–barring record improvement because the employee used FMLA–as the reason there was no injury. Because Southwest concedes Mr. Harden otherwise met the perfect attendance requirements in Q1 2020, a jury could find he would have banked points to negative two and, holding the later events constant, stood at 11.5 rather than 13.5 on his termination date. At a minimum, the lost Q1 2020 reduction creates a triable dispute as to causation.

**Valerie Barajas**. Ms. Rea concedes Ms. Barajas took Care of Family Member Intermittent FMLA ("PLFM") on December 17–18 and FMLA (MEDI) on December 30–31, 2022. (Dkt. No. 221-2, ¶ 24(d).) Ms. Rea identifies a single non-FMLA event–LSCK on December 16–as the only attendance event that prevented Ms. Barajas from receiving a one-point December bonus. But Ms. Rea admitted she could identify no CBA provision, Quick Reference Chart entry, or written policy providing that an LSCK defeats the December bonus, testifying she would have to research the question and consult labor relations and the union. (Erlich Decl., Ex. D, Rea Dep. at 48:2–52:17.) The dispute is outcome-determinative: with the December bonus, Ms. Barajas would have entered 2023 at

9.5 points and held only 11 after her two Q2 events, not the 12 Southwest asserts. (Dkt. No. 221-2, ¶ 24(e)–(f).)

**Pamela Unger**. Ms. Rea admits Unger's FMLA use barred record improvement in Q3 and Q4 2019, costing her four points, but does not account for the December 2019 and 2020 Perfect Attendance bonuses Ms. Unger would have received but for her FMLA use. (Dkt. No. 221-2, ¶ 25(c), (d); Erlich Decl., Ex. F, Unger Dep. 106:20–108:15.) Ms. Rea's response, that the loss "did not matter" because of later roll-off mechanics, is, on her own testimony, an assumption rather than history. (Dkt. No. 221-2, ¶ 25(e)–(l); Erlich Decl., Ex. D, Rea Dep. at 30:23–35:8.) Ms. Unger entered Q4 2021 at 11 points and reached 12 only on a one-point Failure to Report ("FTR") for checking in two minutes late on a trip that departed on time and that she worked in full. (Dkt. No. 221-2, ¶ 25(l); Erlich Decl., Ex. F, Unger Dep. at 38:24–39:13.) If Ms. Unger received the December bonuses Ms. Rea ignores, she would never have crossed the 12-point threshold.

**Alexander Macall Smith**. Ms. Rea concedes that Ms. Smith took intermittent FMLA in Q1 2019 on January 18–19, but omits her further FMLA use on March 14–16, 2019, which barred her from all Q1 2019 record improvement. (Dkt. No. 221-2, ¶ 26(a).) The Personal Illness Note 1st Quarter ("PN1") event Southwest says independently defeated Perfect Attendance did not occur until March 31, which is after the FMLA injury had already accrued, so the possibility that another event also barred record improvement does not erase the FMLA injury.[5] And Ms. Smith testified that flight attendants had no access to the point cards on which Ms. Rea now relies, and instead had to contact Attendance and Leave to learn their balances and roll-off dates. (Erlich Decl., Ex. G, Smith Dep. at 49:7–50:22.) Whether Smith could have banked points and whether her later record would have unfolded identically are disputed questions.

---

[5] Once a flight attendant like Ms. Macall Smith is barred from point-reduction benefits by FMLA leave, her circumstances are changed. Since a PN1 is a non-chargeable event that only blocks perfect attendance, the calculus for taking this form of leave is different once you are already disqualified from perfect attendance by taking FMLA leave. This is especially true where the flight attendant is aware, as Ms. Macall Smith testified, that FMLA leave barred her from record improvement. (See Erlich Decl., Ex. F, Macall Smith Dep. at 53:17-54:17.) This illustrates why reasoning from counterfactuals cannot establish an undisputed fact as to causation.

**Natalie Patterson**. Ms. Rea's own figures show that, but for her FMLA use, Ms. Patterson should have had fourteen points removed across seven quarters. (Dkt. No. 221-2, ¶ 27(a), (f), (g), (h), (l), (m), (n).) Southwest's contrary result rests on the clean-slate counterfactual and on treating Personal Leave with No Pay ("LVNP" or "LVN") as an independent disqualifier in Q1 2021. Ms. Rea admitted LVNP and LVN are the same personal-leave code that Southwest's own chart classified non-chargeable, and supplied no pull-sheets to verify which occurrences the later record-improvement entries supposedly removed. (Dkt. No. 221-2, ¶ 27(b) & n.13, (e).) A jury need not assume that an employee carrying two-to-four points would have followed the identical employment path as one at nine or ten. Ms. Rea's figures create, rather than eliminate, a triable causation dispute.

**Cierra Brooks**. Ms. Rea concedes Ms. Brooks took intermittent FMLA in Q2 2024 on May 26–27 and June 10–12, and rests the "no injury" conclusion on classifying FTGA (Fatigue, inactive for the day) and LVNP (Personal Leave with No Pay) as Record-Improvement-defeating events. (Dkt. No. 221-2, ¶ 28(f).) But there is no written, code-by-code policy supporting those classifications and no CBA provision making LVNP a chargeable occurrence. Moreover, the Quick Reference Chart classifies the same personal leave as non-chargeable. (Erlich Decl., Ex. D, Rea Dep. 12:6–13:17, 44:1–48:1; Dkt. 139-3.) Ms. Rea's post-deposition claim that the charts were "incorrect" for years, Dkt. No. 221-2, ¶ 37, is undercut by her own testimony that she does not use the chart and does not know whether the eighteen attendance-and-leave employees use it. (Erlich Decl., Ex. D, Rea Dep. at 16:24–18:12.) A jury could find Ms. Rea's shifting explanations are not credible, and that she is describing positions convenient to the present motion rather than a consistently applied policy.

**Lexus Mitchell**. Ms. Rea concedes Ms. Mitchell took continuous FMLA in Q4 2023 on November 15–26, and asserts that her Fatigue, inactive for the day ("FTGA") prevented record improvement. (Rea Decl. ¶ 29(a).) But Ms. Rea admitted there is no written policy that FTGA is a chargeable occurrence, that FTGA appears in no Quick Reference Chart, and that FTGA is not referenced in the CBA. (Erlich Decl., Ex. D, Rea Dep. 39:8–42:7.) Because no written rule corroborates her categorical treatment of FTGA, a jury need not accept her testimony that FTGA, rather than FMLA, prevented Ms. Mitchell from receiving a Record Improvement bonus.

//

**Na'Keya Snoddy**. Ms. Rea concedes that, absent the FMLA disqualification, Ms. Snoddy would have received record-improvement reductions totaling five points–including a two-point Q2 2019 reduction she would have received despite the events that defeated the perfect-attendance benefit. (Dkt. No. 221-2, ¶ 30(b), (d).) Southwest's defense is that those five points later vanished under Ms. Rea's clean-slate reconstruction. But Ms. Snoddy entered Q3 2021 at 11 points and reached 13.5 on a single 2.5-point Sick Leave 1 ("SL1"); if even two of the five conceded points survived, she began Q3 at no more than nine and ended no higher than 11.5, below the termination threshold. (Dkt. No. 221-2, ¶ 30(k).) Ms. Rea supplied no pull-sheets tracing each later roll-off and record-improvement entry to the occurrence supposedly erased, and no reviewer verified that mapping, so the accuracy of her deletions is a material factual question, not harmless arithmetic. (Erlich Decl., Ex. D, Rea Dep. 29:5-17; 30:9-22.)

**Colleen Church**. Ms. Rea treats LVNP as a chargeable occurrence that prevented Ms. Church from Record Improvement. (Dkt. No. 221-2, ¶ 31(b).) But Ms. Rea admitted LVN and LVNP are the same code that Southwest's chart classified as non-chargeable; Ms. Rea offered the "charts were wrong" explanation, and additional charts, only after her deposition. (Erlich Decl., Ex. D, Rea Dep. 44:1–48:1; Rea Decl. ¶¶ 36–37 & Exs. O–P.) Separately, Ms. Church sought FMLA for April 4–6, 2024; Southwest approved only April 6 and assessed three points for April 4–5, which Ms. Church repeatedly asked to have designated FMLA and removed, to no avail. (Erlich Decl., Ex. H, Church Dep. 52:2–12, 53:7–54:3; Rea Decl. ¶ 31(e).) Southwest concedes those three points are the only events that disqualified her, which constitutes a triable dispute over whether the challenged policy stripped her record improvement.

**Bryan Henderson**. Ms. Rea's "earlier termination" opinion rests on two disputed Q2 2024 assumptions: that a single FTGA on May 23 defeated Mr. Henderson's quarterly record improvement, and that 1.5 points of record improvement on June 24–26 must be erased under an earlier clean slate; together, according to Ms. Rea, his points would then be placed at 7.5 entering Q3 2024, so that two 2.5-point no-shows would have amounted to 12.5 in August. (Dkt. No. 221-2, ¶ 32(p)–(q).) Neither assumption is undisputed: Ms. Rea admitted FTGA appears in no CBA provision or quick reference chart and identified no written policy making it chargeable or record-improvement-defeating (Erlich

Decl., Ex. D, Rea Dep. 39:8–42:7), and she supplied no records verifying why the June reductions must be removed. Rejecting either assumption leaves Mr. Henderson below 12 even after the event Southwest claims caused his actual termination.

4. The roll-off-erasure theory contradicts Southwest's theory as to why its policy did not violate the FMLA.

As noted, for several class members (including Pamela Unger, Bryan Henderson, Na'Keya Snoddy, and Natalie Patterson), Southwest's causation theory depends on the premise that crediting an earlier record- improvement reduction would have brought the member to a "clean slate," erasing points that later rolled off, so that the class member ends up at the same or a higher balance. (Rea Decl. ¶¶ 16, 25, 27, 30, 33.) That theory defeats Southwest's central argument as to why its policy is legal, as it concedes that taking FMLA leave changed these class members' downstream point trajectories—the very opposite of the "clean freeze, nothing is lost" premise on which Southwest's merits argument rests. Southwest cannot simultaneously argue that leave changes nothing and that crediting the leave-affected reductions would have rippled through later quarters to the members' detriment. At a minimum, the tension between the two theories provides another basis precluding summary judgment.

5. The motion does not reach the injunctive classes.

Southwest's standing challenge is limited to "termination-based claims or damages." (Mot. at 18.) It does not—and cannot—reach the Rule 23(b)(2) nationwide and California injunctive classes, whose members seek prospective relief against the policy and whose standing does not depend on any termination. Indeed, a court in this District, applying the very authority Southwest relies on, held that "[n]either *TransUnion* nor *Healy* … addressed injunctive relief classes," and that they therefore "do not control" a challenge to such classes. *Axelrod v. Lenovo (U.S.) Inc*., No. 21-cv-06770-JSW, 2026 WL 1270792, at *1 (N.D. Cal. Apr. 6, 2026).

6. Mitigation does not deprive Ms. Littles or Ms. Smith of standing.

Southwest's contention that Nicole Littles and Alexander Macall Smith "fully mitigated" their economic losses (Mot. at 17:8-11) does not impact their standing. Full mitigation of back-pay zeroes out a single component of one damages theory; it does not erase the lost-benefit injury, eliminate FMLA liquidated damages, or negate class membership and the availability of injunctive relief. Mitigation is, moreover, already a disputed issue on this record. (Dkt. 208.) It is not a basis for

summary judgment.

**C. Natalie Patterson Should Not Be Dismissed on Summary Judgment.**

Southwest cites no rule or decision holding that a deceased class member forfeits an otherwise viable claim merely because the defendant did not complete her deposition before her death. Instead, Southwest relies on an informal case-management comment and incomplete email statement by Plaintiffs' counsel. (Mot. at 11:26–12:8, 17:12–25.) But Southwest identifies no order compelling Ms. Patterson's deposition, no order imposing dismissal as a discovery sanction, and no merits ruling that the absence of a deposition extinguishes her claim. Rule 56 requires Southwest to establish that no genuine dispute of material fact exists and that it is entitled to judgment as a matter of law; the absence of one form of discovery does not itself satisfy that burden. Fed. R. Civ. P. 56(a), (c)(1); *see Celotex*, 477 U.S. at 323, 325 (movant "always bears the initial responsibility of … identifying those portions of [the record] … which it believes demonstrate the absence of a genuine issue of material fact," and discharges that burden only by "pointing out … that there is an absence of evidence to support the nonmoving party's case"); *id*. at 328 (White, J., concurring) ("It is the defendant's task to negate, if he can, the claimed basis for the suit.").

Ms. Patterson's testimony was not necessary to establish Southwest's liability for its uniform policy. In certifying the class, the Court held that "Southwest's liability for FMLA interference can be established through common evidence because Southwest's challenged attendance policy applied uniformly across the class," and that Southwest's own attendance records would establish which members were denied point reductions because they used FMLA leave. (Dkt. 106 at 13–14.) Ms. Patterson's attendance records establish her FMLA usage, the Record Improvement she was denied, her point history, and her eventual termination. Southwest itself relies exclusively on those records and Rea's retrospective and hypothetical calculations to argue that Ms. Patterson would have been terminated anyway. As explained above, that causation theory is disputed. The inability to question Ms. Patterson does not transform Ms. Rea's disputed counterfactual into an undisputed fact. *See Anderson*, 477 U.S. 242, 255 (1986) ("the weighing of the evidence, and the drawing of legitimate inferences from the facts[,] are jury functions, not those of a judge … ruling on a motion for summary judgment").

Nor is Ms. Patterson's testimony indispensable to calculate economic loss. Plaintiffs produced Ms. Patterson's W-2s, payroll records, and Social Security records. Southwest also subpoenaed her employment records from Amazon in August 2025, giving it an independent means to obtain her subsequent earnings information. Those records establish Ms. Patterson's actual post-termination earnings and permit calculation of the appropriate earnings offset, which Plaintiffs' expert Dr. Petersen has completed.

To the extent Southwest contends it needed Ms. Patterson's testimony to develop a failure-to-mitigate defense, that also does not support dismissal. The Court has excluded the portions of Southwest's expert Karl Volk's report opining about what substantially equivalent employment class members could have obtained and whether their job-search efforts were reasonable. (Dkt. 208 at 7–10, 15.) The Court's remaining mitigation analysis focused on evidence of available flight-attendant positions and testimony that class members had obtained or observed comparable flight-attendant work—not on Mr. Volk's alternative-career opinions. (*Id*. at 13–15.)

Southwest fails to identify any specific element of Ms. Patterson's claim that could be established only through her testimony, or any particular question whose absence prevents adjudication of liability, causation, or actual earnings. At most, Ms. Patterson's unavailability may affect the evidence available concerning a discrete component of Southwest's mitigation defense. It does not justify extinguishing a claim otherwise supported by Southwest's own business records and Plaintiffs' documentary damages evidence.

Finally, the estate-representation issue is being addressed. On July 24, Plaintiffs circulated a stipulation substituting Judith Peavy, the duly appointed administrator of Ms. Patterson's estate, as the appropriate representative. See Fed. R. Civ. P. 25(a)(1) (providing for substitution of a deceased party whose claim survives). Ms. Patterson's death before Southwest completed her deposition supplies no basis for summary judgment, and Southwest's request to dismiss her claim should be denied.

**D. Southwest Is Not Entitled to Judgment That Its Policy Is Lawful.**

Southwest continues to recycle arguments that have already been rejected multiple times. In denying Southwest's motion to dismiss, for example, the Court, among other things, rejected Southwest's argument that point-reduction benefits are a bonus that can be withheld when an

employee takes FMLA leave without interfering with FMLA rights: "The policy here is not comparable to that bonus because it takes away something to which Plaintiff would have been entitled had he not taken leave." Dkt. No. 25 at 11:15-16. Defendant has not put forward a single fact that would make the analysis of its summary judgment motion any different from the analysis that required the denial of its motion to dismiss. Indeed, the Court acknowledged at oral argument for Plaintiffs' motion for summary judgment as to liability that the subject policy is "harsher" than "the policy in *Dyer,*" which served as a basis for denying summary judgment in that case. Dkt. 167 at 6:13-16; 8:24-25 ("I get it, this policy is harsher than *Dyer*").

Upon reexamination, there is at minimum a question of fact as to whether the subject policy violates the FMLA.

1. Southwest violates the FMLA by using protected leave as a negative factor under a no-fault attendance policy.

The FMLA makes it "unlawful for any employer to interfere with … the exercise of … any right provided" by the statute. 29 U.S.C. § 2615(a)(1). Interference is "activity that tends to chill an employee's freedom to exercise FMLA rights," and the inquiry is whether the employer's conduct makes an employee "'less likely to exercise their FMLA leave rights'" by attaching a negative consequence to protected leave. *Olson v. United States*, 980 F.3d 1334, 1338 (9th Cir. 2020); *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001). Because "attaching negative consequences to the exercise of protected rights … tends to chill an employee's willingness to exercise those rights," *id.*, a violation "can take many forms including, for example, using FMLA leave as a negative factor in … disciplinary actions, and no-fault attendance policies." *Olson*, 980 F.3d at 1338; 29 C.F.R. § 825.220(c).

That is exactly what Southwest's policy does, on its own admissions. Record improvement is an "employment benefit," 29 U.S.C. § 2611(5), as the removal of an attendance point "is a benefit in approximately the sense in which granting parole is a benefit to the parolee; it reduces a penalty," *Bailey v. Pregis Innovative Packaging, Inc.*, 600 F.3d 748, 750–51 (7th Cir. 2010)—and the FMLA guarantees its restoration "in the same manner and at the same levels as provided when the leave began," 29 C.F.R. § 825.215(d)(1); *see also* 29 U.S.C. § 2614(a)(1)(B). Southwest concedes that a

single day of intermittent FMLA leave disqualifies a flight attendant from all four record-improvement benefits for the quarter or month. (Erlich Decl., Ex. A, Dkt. No. 139-7 (RFA Responses).) The taking of protected leave is thus itself the disqualifying event, and the flight attendant returns with fewer accrued reductions than she would have but for the leave. This is the use of FMLA leave "as a negative factor" under a "no-fault attendance polic[y]" that section 825.220(c) forbids. The Sixth Circuit, applying *Bachelder*, held the same in *Dyer*: stripping a point-reduction benefit for FMLA use interferes with FMLA rights "even though the FMLA leave itself does not count toward the … point limit." *Dyer*, 934 F.3d at 478; *see id.* at 476–77.

Southwest cannot escape this by insisting Plaintiffs must show FMLA leave was treated worse than some comparable non-FMLA leave. The negative-factor analysis "does not require a showing that an employer treated FMLA less well than equivalent types of leave"; differential treatment "is not a prerequisite for an FMLA interference claim." *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1133–35 (9th Cir. 2003). Section 825.220(c) presents differential-treatment and negative-factor analysis as alternative paths to a violation, and this Court has already rejected Southwest's attempt to graft differential-treatment as an essential element of the FMLA. (Dkt. No. 25 at 9:27–11:4.) Nor is it any answer that some members took leave despite the penalty: under *Dyer*, once an employer attaches a negative consequence to protected leave, the chilling effect exists as a matter of law. *Dyer*, 934 F.3d at 476. The violation is complete on Southwest's own admissions, and at a minimum there is a triable issue as to a violation. (*See* Dkt. No. 25 at 7:25–9:13; Erlich Decl., Ex. A, Dkt. No. 139-7 (RFA Responses).)

2. <u>The Subject Policy Does Not Apply a Permissible Freeze.</u>

Southwest, in its moving papers, writes: "Southwest freezes; it does not reset." This common refrain, repeated through the years of this litigation, is demonstrably false. (*See* Erlich Decl., Ex. A, Dkt. No. 139-7 (RFA Responses).) While it would be convenient for Southwest if the concept of a freeze under the FMLA did not apply to days accrued toward a benefit, it does, as the Court in *Dyer* made clear:

//

//

> In other words, Dyer's FMLA leave could freeze the accrual of attendance but could not reset it; upon returning, Dyer was entitled to the days of attendance he had accrued when leave began and to continue accruing them in the same way. In two separate opinion letters, the most recent of which was issued in August 2018, the Department of Labor applied these regulations to no-fault attendance and point-reduction policies and stated that accrual toward point reduction must, at the very least, be frozen during FMLA leave. In its 1999 opinion letter, the Department of Labor opined that an employer's FMLA obligation to restore an employee to the same or equivalent position includes the obligation to restore the number of days accrued toward absentee point reduction. See 1999 FMLA Ltr., 1999 WL 1002428, at *2. It clarified the point by example: "If the employee had 45 days without a recordable [absence] at the time the unpaid FMLA leave commenced, the employer would be obligated to restore the employee to this number of days credited without an [absence]." Id. In 2018, the DOL reaffirmed the point, approving a policy under which "the number of accrued points remains effectively frozen during FMLA leave." *See* 2018 FMLA Ltr., 2018 WL 4678694, at *2. Although these letters are not binding, they are entitled to persuasive effect. *See Christensen v. Harris Cty*., 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000).

*Dyer*, 934 F.3d at 477 (emphasis added).[6]

Under Southwest's policy, flight attendants who took a single day of FMLA leave were disqualified for an entire quarter from receiving the three quarterly point-reduction benefits and disqualified from the one monthly point-reduction benefit. (*See* Erlich Decl., Ex. A, Dkt. No. 139-7 (RFA Responses).) Southwest cannot, by force of repetition, convert its policy into a permissible freeze by calling it one. Even Southwest's own arguments undermine its position: "Thus, an employee who entered leave with 45 incident-free days," Southwest writes, "had to return with those same days …" (Mot. at 14:3-5, citing Op. Letter FMLA-100, 1999 WL 1002428 at *2 (Jan. 12, 1999).) It is undisputed that, under the subject policy, a flight attendant who took FMLA leave for one day after 45 days without a chargeable occurrence would lose access to all quarterly record-improvement benefits. This is an impermissible diminution of accruals toward a benefit, even under the letter that Southwest cites to approvingly.

More importantly, Southwest's own contemporaneous description demonstrates that it understood the difference between a true freeze and the forfeiture challenged here. Southwest's letter

---

[6] The 1999 and 2018 DOL opinion letters Southwest invokes do not entitle it to judgment. They require only that "accrual toward point reduction ... be frozen during FMLA leave"—describing a policy materially different from Southwest's forfeiture, and one this Court has already found does not "precisely match" a policy that lets "leave days ... spoil the calendar quarter." (Dkt. 25 at 10–11.)

to the DOL shows that it knows what a permissible freeze is under FMLA law. In that letter, sent in March 2019, Southwest defends its policy by referring to the way that it froze benefits under its now bygone 16 Month Roll Off policy: "Thus, if the employee in this example had taken thirty days of intermittent FMLA leave since November 4, 2017, their points would roll-off thirty days later than otherwise …" (Dkt. 139-5 at SWA_000765.) Southwest froze the 16 Month Roll Off: a flight attendant's leave "extends the 16 Month Roll Off date by the number of days of the absence," so that the employee returns "with the same point balance and the same amount of active time remaining." (Dkt. No. 221-2, Rea Decl., ¶¶ 16–17.) That is a paradigmatic freeze. The benefit is paused during leave and restored on return, exactly as *Dyer* and the Department of Labor require. So Southwest knows how to apply a compliant freeze when it chooses, but it chose not to apply such a freeze to the monthly and quarterly record-improvement policies at issue here.

Instead, record improvement is treated the opposite way: as Southwest acknowledged to the DOL, the same hypothetical employee "would not be able to improve their attendance record by qualifying for attendance bonuses." (Dkt. 139-5 at SWA_000765.) Southwest's choice to forfeit record improvement is what places this policy on the *Dyer* "reset" side of the line.[7]

3. <u>Southwest's Other Rhetorical Arguments Are Equally Unavailing.</u>

Southwest makes much of the fact that it does not affirmatively assign points for the exercise of protected FMLA rights. However, as *Dyer* makes clear, the assignment of points and the loss of point-reduction benefits may, in a practical view, both be seen as penalties. As we saw above, and contrary to Southwest's misguided accrual argument, the loss of days accrued toward a point-reduction benefit may serve as the basis for FMLA interference. (*Compare* Mot. at 14:17-18 ("Southwest therefore does not erase anything earned before leave—the defect that drove *Dyer*"), *with Dyer*, 934 F.3d at 477 ("Dyer was entitled to the days of attendance he had accrued when leave began").)

---

[7] Southwest's fallback—that record improvement "does not accrue day by day," so there is nothing to freeze—does not distinguish the two benefits. (Mot. at 14:15-16.) The 16 Month Roll Off does not accrue day by day either; it applies in a single sixteen-month step. Yet Southwest freezes it, extending the roll-off date "day-for-day" for leave taken in the interim. Dkt. 221-2, Rea Decl., ¶ 17. Southwest offers no reason, grounded in the statute or its own mechanics, why one long-horizon, non-daily benefit is frozen and the other forfeited.

Southwest's invocation of 29 C.F.R. § 825.215(c)(2) does not help it, because it addresses a route to liability Plaintiffs do not travel. Section 825.215(c)(2) (equivalent-leave treatment) and § 825.215(d) (restoration of accrued benefits) are two independent bases for an interference violation, and neither is a prerequisite to the other. *Dyer* ties its holding to the latter: a jury could find interference "by not freezing the accrual" of the benefit during leave, and by "fail[ing] to restore [the employee's] accrued employment benefits as required by the FMLA." 934 F.3d at 478; *see* 29 C.F.R. § 825.215(d)(1)-(2); 29 U.S.C. § 2614(a)(2). That is the form of interference central to this case, and Southwest's forfeiture of record improvement establishes it for the reasons shown above. *Dyer* reached equivalence only as a separate, alternative ground—"[i]n addition," an employer "is not entitled to summary judgment if FMLA leave is treated less favorably than other equivalent leave statuses." *Id*. Satisfying section 825.215(c)(2) is therefore not an element of Plaintiffs' restoration-based claim; this Court has already so held. (Dkt. 25 at 10.) Southwest's assertion that its "policy follows" § 825.215(c)(2) (Mot. at 13:3-4), is thus beside the point, and unsupported besides, since Southwest never identifies a single equivalent non-FMLA leave it treats the same. Finally, Southwest's assertion that section 825.215(c)(2) "permits pauses," (*id*. at 15:21-22), proves only that a lawful freeze is permitted. But Southwest forfeits record improvement; it does not pause it.

Finally, relying on Ms. Rea's self-serving declaration, Southwest argues that flight attendants on FMLA were considered "inactive." Ms. Rea, for example, purports to render flight attendants who took one and two days of FMLA leave off as "inactive" for quarters in which they otherwise worked steadily through. (*See* Dkt. No. 221-2, Rea Declaration, ¶¶ 5, 9, 10, 14, 16, 34.) Not only does this contradict the operative CBA, which only refers to inactive employees being out for 14 days or more, but it does not change the fact that Southwest's record improvement policy is a penalty. (Erlich Decl., Ex. I, CBA at ¶ 19(K) at 19-140 ("a Flight Attendant on a leave of absence fourteen (14) days or less will be considered on active status").) And while the Rea declaration invokes the word "inactive" 18 times, the word does not appear in either Southwest's contemporaneous explanations to its employees or the DOL. (*See* Dkt. Nos. 139-4 and 139-5.) A penalty by any other name is still a penalty. Relabeling the consequence as 'inactive status' does not change the fact that FMLA leave caused the loss of Record Improvement.

4. <u>The CFRA, wrongful-termination, and UCL claims survive with the FMLA claim.</u>

Because the FMLA interference claim survives, so do the derivative claims. The CFRA is the "state counterpart" to the FMLA, and "the same standards apply." *Xin Liu*, 347 F.3d at 1132 & n.4 (9th Cir. 2003); Dkt. 25 at 11. The wrongful-termination and unfair-competition claims are derivative of the FMLA and CFRA violations and survive for the same reasons. *Id.*

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Southwest's motion for summary judgment and its alternative request for partial summary judgment in its entirety.

Date: July 30, 2026

ERLICH LAW FIRM, P.C.
/S/ *Jason Erlich*

______________________________
By: Jason M. Erlich, Esq.
John E. Eckert, Esq.

ANDRUS ANDERSON LLP
Jennie Lee Anderson, Esq.
Attorneys for Plaintiffs and Certified Classes and Subclass